**In re BICOASTAL CORPORATION, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 10, 1995.

See also, 176 B.R. 966.

Harley Riedel, Tampa, FL, Donald E. Engle, St. Paul, MN, Robert H. Wheeler, Chicago, IL, for debtor.

Timothy D. Wittlinger, Detroit, MI, Allan C. Watkins, Tampa, FL, for York International.

William Goldman, New York City, for Creditors' Committee.

### ORDER ON OBJECTION TO CLAIM OF YORK INTERNATIONAL CORPORATION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a confirmed Chapter 11 case and the matter under consideration is the reorganized Debtor's Objection to Claim Number 3278 filed by York International Corporation (York). The claim was filed in the amount of $619,564.57 and states that it is based upon "Indemnity for York's liability to Limbach Company arising from sale by York to Limbach of defective Singer products." The Debtor, which was formerly known as the Singer Company (Singer), asserts that York has no contractual right to indemnification and also that Singer's products were not defective at the time that they left the Singer facility.

During the course of the proceedings, York filed a Motion for Summary Judgment contending that there were no genuine issues of material fact, and that the Debtor's Objection should be overruled and its claim should be allowed as a matter of law. On April 16, 1993, this Court entered an Order and denied York's Motion. In this Order, the Court determined that there are genuine issues of material facts concerning both issues raised by the Debtor's Objection to York's Claim.

At the outset of the final evidentiary hearing, this Court severed the issue of damages from the issue of liability and ruled that the trial would deal only with the issue of liability. In the event that liability is found, the Court reserved the question of whether York would then be required to establish its damages, or whether the Michigan state court's determination of damages would be accepted.

The facts as developed at the final evidentiary hearing and relevant to the issues specified above can be summarized as follows:

This controversy initially stems from the development in the mid–1970's of a project known as the Renaissance Center in Detroit, Michigan. The Renaissance Center consisted of a large complex which included a restaurant and shopping area, a hotel and four office towers. Limbach Company (Limbach) was the chief mechanical contractor for the project and subcontracted the heating, ventilating and air-conditioning (HVAC) work to York. The S–3 system, which constituted one portion of this HVAC work, was designed to heat the four office towers. In August of 1974, York purchased 32 steam distribution coils from Singer for placement in the S–3 system. Singer manufactured the 32 coils at its facility in Wilmington, North Carolina, and delivered them to the project site, but did not install the coils and had nothing to do with the design of the S–3 system. In any event, it appears that the coils were installed in approximately 1976 or 1977, and that leaks began to develop in the coils by the winter of 1977–1978. According to the stipulated testimony of William Maines, all of the coils in the S–3 system leaked from the joints as well as from very small holes on the face of the coils. Nevertheless, the S–3 system was operated for approximately four years with the Singer coils, and the coils were then removed in 1980 or 1981.

In 1979, Limbach sued the Renaissance Center Partnership, the owner of the project, in the state court in Michigan for breach of contract. The Partnership then filed a counterclaim against Limbach alleging various deficiencies in the construction of the project, including the heating and air-conditioning systems. Limbach filed a third-party action against York claiming that certain deficiencies were actually caused by defective equipment used in the system. York subsequently filed fourth party actions against the Debtor and other suppliers claiming that the parts furnished by them were defective. The Debtor answered the fourth-party complaint and demanded a jury trial. The state court thereafter bifurcated the proceeding and ruled that it would first try the original claim against the Partnership, the counterclaim against Limbach, and the third party claim against York, and that after these proceedings were concluded it would then try the fourth party claims against Singer and the other suppliers. Singer accordingly did not participate in the first stage of the litigation which ended on February 8, 1990, when the state court in Michigan entered a Corrected Partial Final Judgment in favor of the Partnership and against Limbach pertaining to the steam coils in the S–3 systems. This award was in the principal amount of $209,-744.28. The Corrected Partial Final Judgment also included a determination that Limbach is entitled to recover this same amount from York. The state court previously had ruled on April 7, 1988, that its findings of liability from the first stage of the proceedings were binding on Singer and that Singer was estopped from relitigating the issues surrounding the alleged defects in the S–3 coils. On April 4, 1991, however, the Michigan Court of Appeals reversed this order and ruled that "Singer should not be bound to the trial court's finding" regarding the existence of any manufacturing defect. Consequently, based on this decision of the appellate court, it appears undisputed that the findings of the Michigan state court concerning the manufacture of the coils have no binding effect in this proceeding.

York's proof of claim states only that it is based upon "Indemnity for York's liability to Limbach." (sic) The Orders entered by the trial court in Michigan are attached to the Proof of Claim as exhibits. The claim was filed on May 14, 1990, prior to the entry of the order by the Michigan Court of Appeals which reversed the trial court's 1988 order and determined that the trial court's findings were not binding on Singer. The Proof of

Claim was never amended. Having realized that it no longer can rely on the trial court's order, York now appears to assert that its claim is actually based on two alternative theories: (1) contractual indemnity; and (2) breach of the implied warranties of merchantability and fitness. In opposition, the Debtor contends that (1) York never had a contractual right to indemnity; (2) that the coils were not defectively manufactured; and (3) and that the manufacturing process of the coils was not the proximate cause of any leakage.

## I. CONTRACTUAL INDEMNITY

■ According to York, its contractual right to indemnity arises from the purchase order or orders under which York requested the 32 steam coils from Singer in August of 1974. York contends that this purchase order contained language which obligated Singer to indemnify York against any liability which it incurred as a result of the coils supplied under the purchase order.

It should be noted at the outset that Rule 3001(c) of the Federal Rules of Bankruptcy Procedure provides that "[whenever] ... a claim is based upon a writing, the original or a duplicate of the writing shall be filed with the proof of claim." In addition, Rule 1002 of the Federal Rules of Evidence states that, in order to prove the content of a writing, the original writing is required. Rule 1002 and Rule 1004 of the Rules of Evidence set forth the circumstances under which a duplicate is permitted or other evidence of the contents may be admissible, none of which is applicable here.

It is clear in this case that neither the original purchase order nor a copy of the purchase order was produced. The only evidence offered by York to establish its contractual right to indemnity was submitted through the testimony of Valentine T. Kartorie. Mr. Kartorie, who has been associated with York for 60 years, testified that he had been unable to locate the actual purchase order for the 32 coils after diligent search, and no copy of the executed or completed purchase order was presented. Instead, Mr. Kartorie was only able to testify that York generally used a form of purchase order in 1974 which included certain conditions on the back of each page. Mr. Kartorie did not testify that he had any personal knowledge of the content of those conditions or whether he was even familiar with the specific terms set forth as conditions to the purchase order. At no point in his testimony did Mr. Kartorie mention an indemnification clause, whether he had ever read such a clause, or York's demand for such a clause.

Under these circumstances, this Court is satisfied that York failed to prove its contractual right to indemnification from the Debtor. York not only failed to produce either the original or a copy of the document upon which it relies for this right, but it also failed to present sufficient indirect evidence upon which the existence of an indemnification clause may be inferred. Thus, its claim based on this theory cannot be recognized.

## II. CLAIM BASED ON DEFECTIVE MANUFACTURE

■ It is undisputed that the S–3 steam coils leaked at some point after the S–3 system commenced operating. According to the stipulated testimony of William Maines, who has been involved in the property management of the Renaissance Center since 1976, all of the coils in the S–3 system leaked, and this leakage was first detected in the winter of 1977–1978. York contends that the leaks resulted from a manufacturing defect for which Singer is responsible, and that this manufacturing defect was the proximate cause of the damage which ensued.

The expert testimony presented indicated several possible causes for the leaks:

A. Thomas Wolowicz is presently the engineering manager of large equipment for York and has been employed by York since 1977. Mr. Wolowicz testified that, in his opinion, the coils leaked as a result of a manufacturing defect, and that the major defect was the improper insertion and brazing or mechanical joining of the tubes in the coils. According to Mr. Wolowicz, this was necessarily a manufacturing defect because the brazed joints were constructed at Singer's facility. It also appears, however, that Mr. Wolowicz did not become involved with

the particular S–3 coils until 1981, and that he never viewed the coils while they were in operation. Consequently, he has no personal knowledge of either the installation or the operation of the coils. It is also significant that Mr. Wolowicz had testified in the state court litigation in Michigan that a cause of the leaking coils could have been a phenomenon known as water hammer, which results from a flaw in the design of the system as a whole that leads to improper drainage and the accumulation of water within the coils. Mr. Wolowicz explained that his objective in the Michigan trial had been to demonstrate that the leakage may have been caused by the installation of the equipment.

B. William Coad is a mechanical engineer and the president of a consulting engineering firm in Missouri. Mr. Coad testified that his investigation revealed strong evidence of water hammer, and that water hammer caused the damage to the coils. Mr. Coad further testified that water hammer is the result of an inadequate or poor system design, and that this system design is independent and not part of the manufacturing process. According to him, it is not the standard in the industry to manufacture coils to withstand the force of water hammer, since the proper solution would be to design the system so that water hammer does not occur. Mr. Coad, of course, was not approached about the Renaissance Center until approximately 1982 or 1983, and did not actually view the S–3 coils until 1994.

C. Joseph Reitblatt was employed as a Chief Engineer at Singer's Wilmington facility during the mid–1970's. Mr. Reitblatt testified that, in his opinion, the leaks arose from three possible sources. First, he stated that the system was missing a mechanism or device that would have enabled it to drain properly and that without this cooling leg or trap leg, water hammer would have occurred and resulted in damage to the coils. Second, the manner in which the coil was installed would not have allowed for any movement as the coil was heated by the steam, which ultimately would cause the coil to crack and leak. Third, Mr. Reitblatt testified that improper handling either during or after installation would have caused the coils to leak. It

should be noted, however, that Mr. Reitblatt's testimony was based primarily on pictures of the equipment presented to him by counsel rather than any personal examination of the coils.

It is clear that none of the three witnesses directly observed the coils at the time when the leaks and damage were developing. Instead, each witness simply has offered his own theory or theories of how the leaks *may have been* caused based on a review of second-hand information obtained after-the-fact. After reviewing the testimony and evidence, the Court can conclude only that the leaks could have been caused by the improper brazing of the joints in the coils at Singer's plant; that the leaks could have been caused by a defect in the design of the S–3 system as a whole which resulted in the phenomenon described as water hammer and the eventual damage to the coils; or that the leaks could have been caused by the improper installation of the coils. The Court can find no basis in the record to afford greater weight to any one of the theories over any of the others. Indeed, even the testimony of William Maines, to which both parties stipulated, acknowledged that water hammer did in fact occur in the S–3 system and that the water hammer would have contributed to the leakage.

This uncertainty surrounding the cause of the leaks is further demonstrated by the witnesses' treatment of the weaknesses in the coils which were described as "pinholes." William Maines first identified these pinhole leaks throughout the face of the coils. In response, Mr. Wolowicz testified that he did not know the cause of the pinhole leaks, but supposed that they could have resulted either from the manufacturing process, or from the unrelated factors of erosion or corrosion. Mr. Coad conceded that he had not viewed the inside of the coils to know what caused the pinholes, but suggested that erosion induced by water hammer would have caused the leaks in the weak areas. Mr. Reitblatt stated that the pinholes would have resulted from impurities in the system which lead to the erosion of the coils, but that he had no actual knowledge of any such impurities. The only point that can be distilled with

certainty from this testimony is that the cause of the pinhole leaks is simply not known, although various theories have been proposed to explain it.

As stated above, the evidence in this case concerning the cause of the leaks consists only of alternative theories developed by the witnesses based on their retrospective investigation of the equipment. This Court can find no basis to determine that any particular theory is more credible than any of the others, or that it is more likely than not that the leaks resulted from one of the specific causes described rather than any other cause.

In conclusion, the evidence regarding the cause of the leakage is at best in equilibrium. Under these circumstances, the Court finds that York failed to satisfy its burden of proof regarding the alleged breach of warranty and failed to establish that any manufacturing defect was the proximate cause of the damage. Accordingly, its claim should be disallowed.

In view of the foregoing, it is

ORDERED, ADJUDGED AND DE-CREED that the Debtor's Objection to Claim Number 3278 be, and the same is hereby, sustained and Claim Number 3278 filed by York International Corporation be, and the same is hereby, disallowed.

DONE AND ORDERED.